UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANNON NOAH MARTIN, | Case No. 1:15-cv-00053-BLW |
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| CITY OF NAMPA, *et. al.*, | |
| Defendants. | |

## INTRODUCTION

The Court has before it Defendant Burns' Motion for Summary Judgment (Dkt. 44). The Court has already dismissed all claims against the City of Nampa, and Martin's counsel withdrew because he had difficulty staying in contact with Martin. Defendant Burns has now askes for summary judgment, and although the Court notified Martin of his duty to respond to the motion, he has failed to do so. As explained below, the motion will be granted.

# BACKGROUND

Martin suffers from ankylosing spondylitis, a disease which has caused the vertebrae in Martin's back to fuse together. Consequently, Martin walks with a "slow shamble" and has a hunched stature. *Compl.* at ¶ 8, Dkt. 1. On August 3, 2013, Martin shopped at a retail store in Nampa, Idaho. *Id.* at ¶ 11. Officer Deny Burns was on routine patrol when dispatch received an anonymous call that Martin was shopping at that store. *Pl.'s Resp.* at 1-2, Dkt. 23. Martin had three outstanding misdemeanor warrants. After the call, Burns and other officers were dispatched to the store in order to serve the warrants on Martin. *Id.*

Burns approached Martin from behind as Martin entered the checkout area. Burns initiated contact with Martin by grabbing Martin's wrist. *Id.* at 3, Dkt. 23. Martin responded by turning away from Burns. *Id.* Burns claims that Martin appeared to reach into his pocket, although Martin claims that he did not attempt to flee or display a weapon. *Answer*, ¶ 10, Dkt. 6; *Compl.*, ¶ 14, Dkt. 1. Burns then grabbed Martin and knocked him to the ground. The facts are disputed as to whether Burns purposefully threw Martin to the ground or inadvertently lost his balance, causing both men to fall to ground. *Compl.*, ¶ 16 (Dkt. 3); *Answer*, ¶ 10 (Dkt. 6). Martin fell to the ground with Burns landing on top of him. Officers then placed Martin's arms behind his back. *Pl.'s Resp.* at 4, Dkt. 23. Martin's spinal condition made it difficult for the officers to move his arms. *Id.*

Martin sustained a wound on his nose and pain in his right shoulder. *Compl.*, ¶ 18,

Dkt. 1. Subsequent X-rays confirmed that Martin suffered a fractured scapula. *Id*. at ¶ 21.

Martin then filed his 42 U.S.C. § 1983 claims against the City of Nampa and Officer

Deny Burns. After he filed the suit, the Police Department conducted an internal

investigation into this use of force on Martin. *Pl.'s Resp*. at 7. This investigation revealed

large discrepancies between the Police Department's written policies regarding use of

force incidents and actual Police Department practice. *Id*.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact

"that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## ANALYSIS

## 1. Qualified Immunity

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011). To determine whether a government official is entitled to qualified immunity, the Court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, (1) violated a statutory or constitutional right, (2) that was clearly established at the time of the challenged conduct. *Moonin v. Tice,* 868 F.3d 853, 860 (9th Cir. 2017). Courts may use their discretion deciding which of the two prongs to analyze first. *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

Martin asserts a Fourth Amendment claim of excessive force. "When evaluating a Fourth Amendment claim of excessive force, courts ask whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Hughs v. Kisela,* 862 F.3d 775, 779 (9th Cir. 2016) (Internal quotation and citation omitted). The Court must balance the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the government's countervailing interests at stake. *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular

situation." *Id.* Thus, the Court must consider reasonableness from the perspective of a reasonable officer on the scene, not from the perspective of 20/20 hindsight vision. *Id.*

"The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether []he is actively resisting arrest or attempting to evade arrest by flight." *Id.* These factors are not exclusive, but the most important factor is whether the plaintiff posed and immediate threat to the safety of the officers or others. *Id.* Still, the Court must consider the totality of the circumstances and consider any factors specific to the situation at hand. *Id.* Officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct." *Id.*

Here, as suggested in Defendant's brief, Martin's excessive force claim is a bit of a moving target because his Complaint alleges certain facts, but his deposition testimony asserts some contradicting facts. The Complaint was sufficient to assert Martin's claims, but it is not evidence. On summary judgment, the Court must consider the actual evidence in the record. As explained above, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000). The non-moving party then must produce evidence sufficient to support a jury verdict in his favor. *Deveraux*, 263 F.3d at 1076. Notably, the non-moving party must go beyond the pleadings and show by way of

affidavits, depositions, answers to interrogatories, or admissions on file that a genuine

dispute of material fact exists. *Celotex,* 477 U.S. at 324. This is the evidence the Court

must consider here, not the allegations in the Complaint.

The Court has combed through the record and considered all of the evidence

which could possibly support Martin's claim. The following excerpts are everything from

Martin's deposition that could possibly support his claim:

1. A: I believe – it felt like another officer hit me from behind. 41:16-17.

2. A: And then I'm still unclear about exactly what happened, whether I was hit from another officer or he put me down. I don't know what happened. I just know I was on the ground suddenly and kind of coming to, bleeding a lot. And then a lot of pain in my shoulder. 42:22 – 43:2.

3. Q: And then when somebody hit you from behind, where did they hit you?
   A: I don't know. I just went down. But it didn't seem like it was him [Burns] at the time because I was looking at him. That's why I felt like it was someone else. 43:12-17.

4. My perspective was I was just on the ground. I didn't know what happened. 43:25 – 44:1.

5. I had a lot of them on me, the cops were on me at that point, more than just Deny Burns. 44:6-8.

6. Q: How did your shoulder get broken?
   A: Well, I'm assuming that when they hit me that's when it got broke, when it was broken.
   Q: You believe somebody hit you and broke your shoulder?
   A: Yes.
   Q: With what?
   A: I'm not sure.
   Q: Did you have any sense that you were hit with an object?
   A: I was hit really fast several times with something. I felt like.
   Q: On your shoulder?

A: In my back, I was facedown, yeah. I mean, I'm not sure what time, did what to me. Once that happens there is just kind of like a pain in that whole region of your body. I don't know what time.

Q: So are you alleging that you were hit when you were on the floor on your shoulder?

A: Yes, absolutely.

Q: Whether that was a punch or an object, you just don't know.

A: Well, it was enough to break my scapula blade in multiple pieces.

Q: I get that, but --

A: I have no idea.

Q: You just don't know.

A: I don't. I kind of seen stars for a minute.

Q: You don't know who hit you.

A: I do not. I know that Deny Burns had physical contact with me at that point.

Q: Yes. I think we can all agree on that, that as you hit the floor he was on top of you, was he not?

A: Yes. 49:2 – 50:11.

7.  Q" As you sit here right now, tell me everything Deny Burns did, you've got him named here, to violate your rights.

A: I'm unclear about that. What he did specifically? I just know he was directly involved because he had contact on my person at that time. Like I said, I didn't see the events happen as they happened. I was involved in the event.

Q: You really don't know that Deny Burns actually did anything to your shoulder, do you?

A: Well, yeah, I know he had ahold of my arm. I know we [sic] was acting on behalf of the Nampa Police Department. I know it was either him or his partner or another police officer working with him that struck me, yes.

Q: Are you suggesting then that the shoulder break, the scapula break, couldn't have happened by landing on the floor?

A: Absolutely.

Q: You are suggesting it could not have happened by landing on the floor.

A: It did not happen by landing on the floor.

Q: And it didn't happen by the way your arm was being held as it went to the floor.

A: I was struck repeatedly.

Q: When you say "repeatedly," can you tell me approximately –

A: More than twice, more than four times. I was hit numerous times
with something hard, blunt.
Q: So at least four times you were hit.
A: I felt like six. I felt like six times.
Q: Approximately six times you were struck in the shoulder.
A: In the back and shoulder.
Q: But you don't by whom or with what.
A: No.
Q: Whatever that was, that incident itself, that striking --
A: It occurred with Deny Burns holding on to my wrist, yes.
Q: -- you believe is what actually caused the shoulder break.
A: Being struck, yes. 74:7 – 75:24.

*Martin Depo.,* Dkt. 44-3.

The Court has also reviewed the deposition testimony of the officers, including

Officer Burns. Officer Burns testified that he "put [Martin] to the ground." *Burns Depo.,*

72:16, Dkt. 44-3. He gives a little more detail about how he "put Martin to the ground"

by indicating that he used a training technique to affect the arrest. *Id.* at 77:12-14. He

explains that his attempt was to stay on his feet, control Martin's arm, and take him down

in a way that prevented Martin from landing with all of his body weight on the ground.

*Id.* at 78:21 – 79:1. But he slipped, and the technique did not work as planned. Instead, he

grabbed Martin's right arm and shoulder, stepped in front of him, used his hip to take him

down, but also fell on top of him as he slipped. *Id.* at 77:20 – 78:19. Nothing in the record

disputes this testimony.

The Court has also reviewed the three videos recorded by the officers' body

cameras. *Kane Aff.,* Exs. C,D, & E, Dkt. 44-3. Most of the footage is irrelevant. The only

relevant portion is a few seconds of very blurry footage of the moment Martin is taken to

the ground. At best, it shows Officer Burns taking Martin to the ground as explained in Burns' deposition.

Taking all of this evidence in the light most favorable to Martin, the Court finds as a matter of law that Burns did not use excessive force. Martin makes clear that his injury was not the result of landing on the ground. And it is clear that Burns was the officer who put Martin on the ground. Instead, Martin states that his injuries resulted from being struck. But he also makes clear that Burns was not the officer who struck him. None of the other testimony or video evidence suggests otherwise.

No reasonable jury would find that Officer Burns' actions were not objectively reasonable in light of the facts and circumstances confronting him. *Hughs,* 862 F.3d at 779. Even assuming the severity of Martin's crime was minor, that Martin posed no substantial threat to the safety of the officers or others, and that Martin was not actively resisting arrest or attempting to evade arrest by flight, Officer Burns' actions were not excessive. As noted above, officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct." *Id.* Taking Martin to the ground to handcuff him is in the range of reasonable conduct here, especially where there is no evidence that Officer Burns injured Martin.

Under these circumstances, Officer Burns is entitled to qualified immunity because he did not violate Martin's constitutional rights under the Fourth Amendment. Thus, the Court need not address whether any constitutional right was clearly established at the time of the challenged conduct. *Moonin v. Tice,* 868 F.3d 853, 860 (9th Cir. 2017).

Moreover, Martin's claim simply fails because he has not asserted a constitutional violation, notwithstanding the qualified immunity analysis. Accordingly, the Court will grant the motion for summary judgment and dismiss this case in its entirety.

## ORDER

**IT IS HEREBY ORDERED:**

1. Defendant Burns' Motion for Summary Judgment (Dkt. 44) is **GRANTED**.

2. Defendant's Motion to Seal (Dkt. 45) is **GRANTED**.

3. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: November 13, 2017

B. Lynn Winmill
Chief Judge
United States District Court